ORDERED.

**Dated: September 30, 2026**

Lori V. Vaughan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re

Christopher Joe Young,

Debtor.

Case No. 6: 24-bk-03698-LVV
Chapter 7

---

John Paul Begley, as the Personal Representative of the Estate of Brandon Kyle Begley,

Plaintiff,

v.

Christopher Joe Young,

Defendant.

Adv. No. 6: 24-ap-00130-LVV

---

**MEMORANDUM OPINION**

Brandon Kyle Begley ("Brandon") attended a weekend retreat at Soul Quest Church of Mother Earth, Inc. ("Soul Quest") in Orlando, Florida, where he participated in purported spiritual ceremonies involving ayahuasca—a hallucinogen. At the conclusion of the weekend, Brandon suffered a medical episode which caused him to thrash about. Christopher Joe Young ("Defendant" or "Young"), Soul Quest's founder and president, was the only trained emergency medical technician

on site. While the episode began that afternoon, Young did not request medical assistance for several hours and only after Brandon suffered a seizure. Brandon was transported to the hospital and later passed away. After a jury trial, Young and Soul Quest were determined to have been negligent in causing Brandon's death. Brandon's father, John Paul Begley, as Personal Representative ("Plaintiff" or "Begley") was awarded $15 million, of which $9 million is owed by Young. Now in bankruptcy, Young seeks to discharge his debt to Begley.

Begley asserts the debt is excluded from discharge and Young should be denied a discharge entirely. Begley contends the debt is excluded because Young willfully and maliciously injured Brandon. Begley further contends that Young should be denied a discharge entirely because he concealed property, failed to maintain adequate financial records, and made false oaths in connection with his bankruptcy case. After considering the testimony and other evidence presented over a two-day trial, the Court concludes that Young's conduct surrounding Brandon's medical emergency, although deeply troubling, does not establish a willful and malicious injury required under § 523(a)(6). The Court further concludes that Plaintiff has not proven the elements necessary to deny Young's discharge under §§ 727(a)(2), 727(a)(3), or 727(a)(4)(A). Accordingly, the debt is not excluded from discharge and Young's discharge will not be denied.

## Findings of Fact

Young founded Soul Quest in 2016 as a § 501(c)(3) non-profit church.[1] Soul Quest held itself out as a ministry of shamanic healing and plant medicine. Young served as Soul Quest's minister and president, oversaw its operations, and had access to the church's finances.[2] Soul Quest practiced its ministry by holding weekend retreats during which participants consumed

[1] Doc. 79 Trial Tr. 95:12-14.
[2] Doc. 79 Trial Tr. 85:12-86:24; 87:17-24.

ayahuasca.[3] Ayahuasca is a tea or brew created by combining Banisteriopsis caapi and chacruna, also known as Psychotria viridis.[4] The active ingredient in ayahuasca is dimethyltryptamine ("DMT") which is a hallucinogenic and a controlled substance listed on Schedule I of the Controlled Substances Act.[5] Young viewed ayahuasca as a spiritual sacrament, and Soul Quest sought permission from the Drug Enforcement Administration ("DEA") to use ayahuasca as part of its religious practice by submitting a petition for a religious exemption in 2017.[6] The DEA rejected Soul Quest's petition, and despite several legal challenges, the DEA's decision was never overturned.[7] Despite the denial, Soul Quest continued operating its retreats. Brandon attended one of those retreats from March 30, 2018, through April 1, 2018.

During the retreat, Brandon participated in multiple ayahuasca ceremonies administered by Anthony Nemeth ("Nemeth") and Lindsay Johnson ("Johnson"), who were affiliates of Soul Quest at the time.[8] By Sunday, April 1, 2018, Brandon had participated in three ayahuasca ceremonies and one kambo session.[9] Kambo is a fluid derived from frog poison.[10] These sessions were administered by Nemeth and Johnson.[11] Nemeth and Johnson both worked as independent contractors for Soul Quest by facilitating spiritual ceremonies.[12] Johnson served as a spiritual leader at Soul Quest and was known within the organization as the church's "matriarch."[13] Young was not present during these ceremonies.[14]

---

[3] Doc. 79 Trial Tr. 95:15-96:19; Doc. No. 80 Trial Tr. 323:4-19.
[4] Doc. 79 Trial Tr. 35:9-24.
[5] 21 U.S.C. § 812; Exh. 42.
[6] Doc. 79 Trial Tr. 39:7-24; Doc. 80 Trial Tr. 241:16-25; Exh. 35.
[7] Exh. 35, 37.
[8] Doc. 79 Trial Tr. 50:20-24; 51:16-25; Doc. 80 Trial Tr. 275:9-276:5.
[9] Doc. 79 Trial Tr. 50:10-19
[10] Doc. 79 Trial Tr. 46:18-23.
[11] Doc. 79 Trial Tr. 50:17–24; 51:22-52:9.
[12] *Id.*
[13] Doc. 79 Trial Tr. 51:20-25; 52:1-5.
[14] Doc. 80 Trial Tr. 254:4-7.

On Sunday afternoon, Soul Quest personnel contacted Young by telephone after Brandon began experiencing a medical episode. Young was informed that Brandon had been consuming water and had locked himself in the bathroom.[15] Young instructed those present to keep Brandon at Soul Quest and prevent him from driving because Brandon was agitated.[16] Although Young believed Brandon's mental state made it unsafe for him to drive, he did not believe Brandon's condition constituted a medical emergency.[17] Around 5:00 p.m. that day, Brandon was found lying on the floor inside the residence and was moved outside and placed on the grass.[18] Brandon was screaming, yelling, flailing his arms, and thrashing.[19] When Young arrived at Soul Quest, Brandon had already been moved outside.[20] Young was the only trained emergency medical technician on site, although he described his training as limited to basic life support.[21] Brandon's thrashing was so violent that Young directed mats be placed underneath Brandon to prevent further grass burns on his body, and he was held down.[22] Young did not seek medical assistance, but instead tried to manage the situation internally.[23]

Young did not tend to Brandon himself. A shaman prayed and worked with Brandon while he remained outside.[24] Nemeth periodically checked Brandon's blood pressure, pulse, and respirations.[25] In Young's view, as long as Brandon's vital signs remained stable, Soul Quest could continue "working with" Brandon.[26] Young did not believe, at that time, that Brandon was

---

[15] Doc. 80 Trial Tr. 254:22-255:10; 283:4-5.
[16] Doc. 79 Trial Tr. 53:5-24.
[17] Doc. 80 Trial Tr. 283:6-20.
[18] Doc. 79 Trial Tr. 54:11-20.
[19] Doc. 79 Trial Tr. 55:6-20.
[20] Doc. 79 Trial Tr. 54:11-18.
[21] Doc. 79 Trial Tr. 32:2-22.
[22] Doc. 79 Trial Tr. 55:1-20; 57:22-25.
[23] Doc. 79 Trial Tr. 70:10-17; 74:16-24; 77:23-78:9.
[24] Doc. 79 Trial Tr. 56:17-24
[25] Doc. 80 Trial Tr. 256:11-22.
[26] Doc. 79 Trial Tr. 64:15-17; Doc. 80 Trial Tr. 256:15-257:5.

experiencing a medical emergency.[27] Young explained that Soul Quest had previously encountered similarly difficult reactions, including complications that did not require hospitalization.[28]

Meanwhile, at the shaman's direction, additional fluid in the form of pinella tea was prepared and given to Brandon by squirting the fluid into his mouth.[29] After Brandon was given the pinella tea, Young noticed a change in Brandon's condition, and concluded that Brandon should be driven to the hospital.[30] Young then realized Brandon was suffering a seizure and contacted 911 for assistance.[31] At that point, several hours had passed since Brandon was moved outside in the late afternoon, and the ensuing 911 call was placed at approximately 8:09 p.m.[32] Brandon was transported to Florida Hospital East Orlando, where he later passed away.[33]

After Brandon's death, his father, Begley, was appointed as the Personal Representative of Brandon's estate. On March 25, 2020, Begley filed a wrongful death action in the Ninth Judicial Circuit Court of Florida against Young, Soul Quest, and other related parties. Following a jury trial, the state court entered a final judgment on May 30, 2024, awarding damages in the amount of $15,048,526.25 (the "Judgment").[34] Of that amount, $6,019,410.50 was entered against Soul Quest and $9,029,115.75 was entered against Young personally.[35] Shortly after the entry of the Judgment, Young and Soul Quest sought bankruptcy protection in this Court.[36] The Court dismissed Soul Quest's bankruptcy case two weeks later on July 30, 2024.[37]

---

[27] Doc. 79 Trial Tr. 57:4-8.
[28] Doc. 79 Trial Tr. 78:5-9.
[29] Doc. 79 Trial Tr. 78:19-79:15.
[30] Doc. 80 Trial Tr. 257:6-12.
[31] Doc. 79 Trial Tr. 79:16-21; Doc. 80 Trial Tr. 257:6-12.
[32] Doc. 79 Trial Tr. 63:12-64:9.
[33] Doc. 79 Trial Tr. 31:19-21; 75:10-13.
[34] Exh. 39, 40.
[35] Exh. 40.
[36] Soul Quest filed a voluntary chapter 11 bankruptcy petition on July 15, 2024. *In re Soul Quest Church of Mother Earth, Inc.*, No. 6:24-bk-03612-LVV. On July 18, 2024, Young filed an individual chapter 7 bankruptcy petition.
[37] *Soul Quest*, No. 6:24-bk-03612-LVV, Doc. No. 67.

As the operator of Soul Quest, Young had access to and oversaw the church's finances including bank accounts and credit cards.[38] During its approximately eight years of operation, more than 30,000 people attended Soul Quest's retreats.[39] Young received a salary of $5,000 per week from Soul Quest for his operational and management duties.[40] In addition to his salary, Soul Quest provided Debtor with a parsonage—a house typically provided by a church for its pastor. Instead of providing living quarters on the church's property, Soul Quest provided Debtor with a monthly allowance for housing expenses such as rent, utilities, insurance, and other similar costs.[41] Debtor received $58,022 per year from Soul Quest for his parsonage.[42] Young and Soul Quest's finances were intertwined. Despite frequent loans between Young and Soul Quest, such transactions were not supported by formal documentation.[43] Young did not maintain a running ledger of loans made or repaid.[44] Young further testified that he borrowed funds through Coinbase and other Bitcoin-related accounts and used those funds for Soul Quest's operations.[45] Soul Quest repaid some, but not all, of those amounts.[46]

Soul Quest also paid some of Young's personal expenses. For example, theme park annual passes and school payments for Young's children were charged to Soul Quest's credit cards.[47] Young explained that some personal charges may have been made inadvertently because he carried multiple credit cards in the same wallet.[48] When Soul Quest lacked sufficient funds to pay its bills,

[38] Doc. 79 Trial Tr. 85:12-86:5.
[39] Doc. 79 Trial Tr. 96:16-23.
[40] Doc. 79 Trial Tr. 86:24-87:7.
[41] Doc. 79 Trial Tr. 88:4-15; Exh. 19.
[42] Exh. 19.
[43] Doc. 79 Trial Tr. 91:9-19.
[44] Doc. 79 Trial Tr. 91:9-19.
[45] Doc. 80 Trial Tr. 262:5-22.
[46] Doc. 80 Trial Tr. 263:5-9.
[47] Doc. 79 Trial Tr. 173:9-174:20.
[48] Doc. 79 Trial Tr. 127:7-17; 184:17-23.

Young covered the expenses using his personal funds or borrowed funds.[49] Although Young later retained a tax attorney to assist with tax matters, he had not retained an accountant to reconcile the amounts owed between himself and Soul Quest.[50] In response to discrepancies among the documents provided to the Court, Young explained that some relevant financial records were available electronically before the bankruptcy filing but asserted that he lost online access to those records after the bankruptcy.[51] Young stated that he had requested statements from Chase and believed a large box of documents had been provided to counsel, although he could not identify the specific documents contained within it.[52] Young also referenced a production of roughly 9,000 pages of records to Plaintiff, although he could not confirm which specific documents it contained.[53]

At the time of trial, not all financial records had been fully collected and reconciled.[54] Certain JPMorgan Chase accounts listed Young's name as an account holder, but Young maintained that the accounts belonged to Soul Quest.[55] Those accounts were included on Soul Quest's bankruptcy schedules rather than Young's individual bankruptcy schedules.[56] Young also maintained that he did not intentionally omit Soul Quest credit cards from his individual schedules because he believed those accounts were already included among Soul Quest's bankruptcy materials.[57] Young's bankruptcy schedules and tax records raised additional questions regarding his reported financial information. Tax documents introduced at trial reflected adjusted gross

---

[49] Doc. 79 Trial Tr. 127:1-6.
[50] Doc. 80 Trial Tr. 324:3-19.
[51] Doc. 80 Trial Tr. 263:10-18.
[52] Doc. 80 Trial Tr. 263:19-264:19.
[53] Doc. 79 Trial Tr. 133:2-5.
[54] Doc. 80 Trial Tr. 264:20-265:17.
[55] Doc. 80 Trial Tr. 265:24-266:10; Exh. 18.
[56] Doc. 80 Trial Tr. 266:2-4; Exh. 18.
[57] Doc. 80 Trial Tr. 266:19-25.

income of $240,500 for 2022 and $225,001 for 2023.[58] Those figures were not consistent with Young's other sworn disclosures. On his statement of financial affairs, Young reported gross income of $260,000 for 2022 and $260,000 for 2023, and neither those figures nor his tax returns included his parsonage benefits. For 2022, the records reflected that Young received $513,599.56 from Soul Quest in direct transfers, paychecks, and account deposits, exclusive of Bitcoin, substantially more than he had reported.[59] Young signed his tax documents, bankruptcy petition, schedules, and statement of financial affairs under penalty of perjury.[60] When questioned about discrepancies between his schedules and tax documents, Young explained that he relied on attorneys and tax professionals for assistance and stated that he was "really, really bad at numbers."[61] Young identified possible omissions at the meeting of creditors and intended to provide the information to counsel so that the schedules could be amended.[62] When asked why additional amendments had not been filed earlier, Young stated that he did not know and believed the amendments were being handled through counsel.[63]

Young's personal background was also developed at trial. He testified that he left school in the eighth grade, later obtained a GED, and completed EMT-related coursework.[64] He claimed that he has dyslexia and ADHD and that reading and numbers are difficult for him.[65]

On December 4, 2024, Begley initiated this adversary proceeding, seeking a determination that his claim against Young is excepted from discharge under 11 U.S.C. § 523(a)(6) and that Young is not entitled to a discharge under 11 U.S.C. §§ 727(a)(2), 727(a)(3), and 727(a)(4)(A).

---

[58] Exh. 32, 33.
[59] Doc. 79 Trial Tr. 119:1-120:5;157:20-158:1.
[60] Doc. 80 Trial Tr. 316:1-20.
[61] Doc. 80 Trial Tr. 316:21-317:8
[62] Doc. 80 Trial Tr. 328:9-24.
[63] Doc. 80 Trial Tr. 329:1-13.
[64] Doc. 80 Trial Tr. 237:23-238:1; 317:21-318:24.
[65] Doc. 80 Trial Tr. 319:17-320:4.

This Court held a two-day trial beginning on April 8, 2026. The evidence presented at trial focused on the circumstances surrounding Brandon's medical emergency at Soul Quest, the timing of the 911 call, the financial relationship between Young and Soul Quest, and the accuracy and completeness of Young's bankruptcy disclosures. On March 23, 2026, Soul Quest affiliates Anthony Nemeth and Lindsay Johnson were deposed. During their depositions, both invoked their Fifth Amendment rights against self-incrimination in response to nearly every question, except questions requesting basic identifying information, such as their names. The questions to which Nemeth and Johnson invoked the Fifth Amendment primarily concerned the events leading to Brandon's death on April 1, 2018.

## Legal Analysis

### Section 523(a)(6)

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). A malicious injury is one that is "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *In re Kane*, 755 F.3d 1285, 1294 (11th Cir. 2014). Willfulness, on the other hand, requires an intent to injure. The Supreme Court in *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998), held that for a debt to be nondischargeable under § 523(a)(6) there must be "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Accordingly, injuries inflicted recklessly or negligently are not excepted from discharge. *Id.* The Eleventh Circuit has read this requirement to encompass an intentional act "which is substantially certain to cause injury," although it has not decided whether that substantial certainty is measured by a subjective or an objective standard. *Kane*, 755 F.3d at 1293. To be declared nondischargeable, the injury must meet the requirements of being both willful and malicious. Plaintiff bears the burden of proof to show that by

a preponderance of the evidence his debt is excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Plaintiff contends that Young's conduct was both willful and malicious under § 523(a)(6) for two reasons. First, Plaintiff argues that Young operated an ayahuasca church the DEA had declined to authorize, invited Brandon to attend, and administered the substance that caused his death. Second, Plaintiff argues that Young, the only individual on site with medical training, failed to summon emergency assistance as Brandon's condition worsened. Under either argument, Plaintiff has not established that Young possessed the requisite intent to injure Brandon.

While Young intended to administer the substance to Brandon, the evidence does not show that he intended to injure Brandon. *Geiger*, 523 U.S. at 61. Nor is there evidence that administering the substance was substantially certain to cause injury. Young regarded ayahuasca as a religious sacrament, and Soul Quest had administered it to more than 30,000 participants over approximately eight years. While there was testimony that some participants had adverse effects, most did not. Even assuming Soul Quest's conduct violated federal law and that the Judgment found Young's conduct negligent, those findings do not establish an intent to injure. Section 523(a)(6) requires more than unlawful or negligent conduct; it requires a deliberate injury or knowledge that injury was substantially certain to occur.

The second ground presents a more difficult factual question because Young's delay in seeking emergency assistance was substantial. Young was the only person present with any medical training. He was told that Brandon had confined himself to a bathroom, consumed large quantities of water, and was behaving erratically. By the time Young arrived, Brandon had been moved outside and was screaming and thrashing with such force that Young directed others to place mats beneath him. Even so, no 911 call was made until approximately 8:09 p.m., roughly three hours after Brandon

was moved outside. That delay reflects a serious failure of judgment and may fairly be described as reckless. Recklessness, however, does not establish that Young intended Brandon's injury or knew that injury was substantially certain to occur.

The record reflects that Young took several actions directed toward assisting Brandon. He directed that mats be placed beneath Brandon to prevent further injury. Nemeth monitored Brandon's blood pressure, pulse, and respirations, and the individuals conducting the ceremony, whom Young had engaged and trusted, advised him that Brandon did not require medical care. Young testified that he believed, although incorrectly, that Brandon was experiencing a difficult reaction of the type Soul Quest had previously encountered without hospitalization. When the pinella tea failed to improve Brandon's condition, Young determined that Brandon should be taken to the hospital and went to obtain a vehicle. Young testified that when he recognized Brandon was having a seizure, he called 911. These circumstances weigh against a finding that Young intended to injure Brandon or believed that injury was substantially certain to occur.

Plaintiff argues that Young should have recognized the danger and sought medical assistance earlier. That may well be true. But a failure to recognize a danger falls within the realm of negligence rather than § 523(a)(6). Treating every reckless failure to obtain medical care as a willful injury would eliminate the distinction the Supreme Court drew in *Geiger* between a deliberate act and a deliberate injury. The Court does not minimize the seriousness of Young's conduct. His delay was a grave lapse in judgment, and it has already resulted in a substantial judgment against him. But a grave lapse in judgment is not the same as a deliberate injury under § 523(a)(6). Accordingly, Plaintiff has not established that Young willfully and maliciously injured Brandon, and the debt is therefore not excepted from discharge under § 523(a)(6).

*Adverse Inference*

To address the evidentiary gap between Young's intent and whether he intended to injure Brandon, Plaintiff asks the Court to draw an adverse inference from the silence of Nemeth and Johnson. Both witnessed the events of April 1, 2018, and both, when deposed in this proceeding, invoked the Fifth Amendment and declined to answer any substantive question about the incident. Plaintiff contends that an adverse inference from their silence supports a finding that Young acted willfully rather than recklessly.

The Fifth Amendment privilege against compelled self-incrimination operates differently in a civil proceeding than in a criminal one. The Supreme Court has noted that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). The issue presented here, however, is somewhat different. Plaintiff asks the Court to draw an adverse inference not from a party to this adversary proceeding, but from non-parties Nemeth and Johnson's refusal to testify. The Eleventh Circuit addressed this circumstance in *Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300, 1311 (11th Cir. 2014), holding that whether an adverse inference may be drawn from a non-party's invocation of the Fifth Amendment must be determined "on a case-by-case basis." In doing so, the Eleventh Circuit adopted the non-exclusive four-factor test set out in *LiButti v. United States*. *Id*. Under that test, courts consider: "(1) the nature of the relevant relationships; (2) the degree of control of the party over the nonparty witness; (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation." *Id.* (quoting *LiButti v. United States*, 107 F.3d 110, 123 (2d Cir. 1997)(internal quotations omitted)). In considering the circumstances of the case, the overarching concern guiding the inquiry "is fundamentally whether the adverse inference is trustworthy under all

of the circumstances and will advance the search for the truth." *LiButti,* 107 F.3d at 124. Plaintiff argues that an adverse inference against Young is warranted because Nemeth and Johnson were directly involved and the questions they declined to answer relate directly to Young's intent and the reasons underlying his failure to call 911. As to this argument, the Court is unpersuaded.

Applying the four *LiButti* factors, three weigh against imputing the witnesses' silence to Young. The first factor, the nature of the relationship, favors imputation, but only modestly. The *LiButti* court explained that this factor focuses on the relationship between the party and the non-party witness. As the court observed, "[t]he closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship." *LiButti*, 107 F.3d at 123. Here, Nemeth was an independent contractor who facilitated Soul Quest's ceremonies, and Johnson was a spiritual leader whom the church referred to as its "matriarch." Both worked within the organization Young founded and operated, a relationship close enough to provide some assurance that they did not invoke the privilege merely to prejudice him. But the record contains none of the objective indications of continuing loyalty that ordinarily strengthen this factor, such as the payment of a witness' legal fees or the coordination of a common defense. *See Coquina*, 760 F.3d at 1311. Further, at the time of their testimony, Nemeth and Johnson were no longer employed by Soul Quest and were not working with Young at all. Accordingly, the first factor only slightly favors imputation.

The second factor, the degree of control, weighs against imputation. The *LiButti* court explained that this factor asks "whether the assertion of the privilege should be viewed as akin to testimony approaching admissibility under Fed. R. Evid. 801(d)(2), and may accordingly be viewed . . . as a vicarious admission." *LiButti*, 107 F.3d at 123. Here, Young was responsible for the day-to-day operations of Soul Quest. That general authority over the organization, however, does not

establish control over a witness. Rather, the relevant inquiry is whether Young exercised control over Nemeth and Johnson with respect to the events in dispute such that their invocation of the privilege could fairly be treated as his own. The record does not support that conclusion. Although Nemeth and Johnson administered Brandon's ceremonies, nothing indicates that Young directed how they did so, instructed them how to respond to Brandon's condition, or influenced their decision to invoke the Fifth Amendment. Their silence therefore cannot fairly be attributed to Young.

The third factor, the compatibility of interests, also weighs against imputation, and it is the most significant one. The *LiButti* court explained that "[t]he trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *LiButti*, 107 F.3d at 123. Consistent with that principle, other cases have imputed a non-party's silence in situations where a party's liability rises or falls with the witness's conduct, just like when a corporation may be held vicariously liable for its agent. See *RAD Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 275-76 (3d Cir. 1986). Here, Young is not such a party. He is an individual debtor, and the only question under § 523(a)(6) is whether he intended to injure Brandon. Nemeth and Johnson may have their own reasons for declining to testify about their conduct, but proof that they acted wrongfully would not establish Young's intent. Their interests and Young's therefore do not rise or fall together.

The fourth factor, the witnesses' role in the litigation, also weighs against imputation. The *LiButti* court explained that "[w]hether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects also logically merits consideration by the trial court." *LiButti,* 107 F.3d at 123-24. Although *LiButti* did not define what constitutes a "key figure," the Eleventh Circuit addressed the concept in *Coquina*. There, the court held that an

adverse inference could be imputed to TD Bank based on the invocation of the Fifth Amendment by its regional vice president because he was a "key figure" in the litigation. As the Eleventh Circuit explained, "Spinosa is a 'key figure' in this case because his alleged actions and misrepresentations formed the bulk of Coquina's complaint." *Coquina,* 760 F.3d at 1311. Here, Nemeth and Johnson are important fact witnesses, and their testimony might have illuminated what occurred at Soul Quest. But their conduct is not the conduct at issue. Unlike the bank officer in *Coquina*, whose alleged misrepresentations formed the heart of the claim against his employer, Nemeth and Johnson are not the individuals whose conduct determines Young's liability under § 523(a)(6). Overall, the Court does not find that an adverse inference here would be trustworthy or would advance the search for truth.

Even if the Court were to draw the requested adverse inference, Plaintiff's claim would still fail. The Eleventh Circuit has long held that "[t]he negative inference, if any, to be drawn from the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production." *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991) (quoting *United States v. Rylander*, 460 U.S. 752, 758 (1983)). An adverse inference may be drawn only when the witness' invocation of the Fifth Amendment is accompanied by independent evidence of the fact to be inferred. *See Coquina*, 760 F.3d at 1313-14. Here, no such evidence establishes that Young intended to injure Brandon, acted out of personal animus, or knew that injury was substantially certain to result from delaying the call to 911. On the contrary, the evidence reflects that Young misunderstood the severity of Brandon's condition and believed that Soul Quest personnel were responding to a difficult reaction to a spiritual ceremony. That belief may have been unreasonable, and Young's resulting conduct may have been negligent or reckless. But absent independent evidence of the willful and malicious intent required by § 523(a)(6), Nemeth's and Johnson's silence cannot, by itself, satisfy Plaintiff's burden of proof.

**Objection to Discharge**

Section 727(a) provides a "court shall grant the debtor a discharge…unless" the debtor committed one of the specific actions enumerated. "The Bankruptcy Code favors discharge of an honest debtor's obligations." *In re Jennings*, 533 F.3d 1333, 1338 (11th Cir. 2008). Generally, objections to discharge are construed liberally for the honest debtor and strictly against the objecting creditor. *Id. See also In re Coady*, 588 F.3d 1312, 1315 (11th Cir. 2009). Courts recognize that "[t]he reasons for denying a discharge… must be real and substantial, not merely technical and conjectural." *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994) (quoting *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987)). To prevail, Plaintiffs must prove their objection to discharge by a preponderance of the evidence. Fed. R. Bankr. P. 4005; *Grogan v. Garner*, 498 U.S. 279, 289-91 (1991). Once Plaintiff has met his burden, "[t]he debtor must bring forward enough credible evidence to dissuade the court from exercising its jurisdiction to deny the debtor discharge based on the evidence presented by the objecting party." *Jennings*, 533 F.3d at 1339 (quoting *In re Prevatt*, 261 B.R. 54, 58 (Bankr. M.D. Fla. 2000)).

*Section 727(a)(2)*

Section 727(a)(2) allows the court to deny the discharge when "the debtor, with intent to hinder, delay or defraud a creditor... has transferred, removed, destroyed, mutilated, or concealed... (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of filing the petition." 11 U.S.C. § 727(a)(2). Under § 727(a)(2), Plaintiff must establish: "(i) a transfer or concealment of property of the debtor or estate, (ii) improper intent, and (iii) an improper act that occurred either during the one year preceding the filing or postpetition." *D.A.N. Joint Venture III, L.P. v. Fasolak (In re Fasolak)*, 381 B.R. 781, 787 (Bankr. M.D. Fla. 2007). A debtor's intent to hinder, delay or defraud his creditors may be established by circumstantial

evidence or inferred from the debtor's course of conduct. *Jennings*, 533 F.3d at 1339; *In re Wright*, 618 B.R. 569, 583 (Bankr. M.D. Fla. 2020).

Section 727(a)(2) is not directed at poor financial recordkeeping or inaccurate financial reporting. Rather, it denies a discharge only when the debtor, with fraudulent intent, disposes property in the year prior to filing bankruptcy or after the petition date. Plaintiff contends that Young treated Soul Quest's finances as his own, freely moved money between himself and the church without documentation, and failed to disclose significant financial information. The evidence supports many of those factual assertions, but does not support a finding that Young transferred or concealed with the intent required by § 727(a)(2).

The financial relationship between Young and Soul Quest was unquestionably intertwined. Young controlled Soul Quest's bank accounts and credit cards, received a weekly salary and parsonage benefits, and paid personal expenses, including theme park annual passes and his children's school expenses, through Soul Quest accounts. Young also borrowed funds through Coinbase and other Bitcoin-related accounts to finance Soul Quest's operations, and Soul Quest repaid only a portion of those amounts. Neither Young nor Soul Quest documented these transactions with care. There was no written loan agreement, no running ledger, and no reconciliation of the amounts Young and Soul Quest owed one another.

Specifically, Plaintiff points to Young's transfer of $148,053.42 to Soul Quest in four transactions that took place January, May, and June 2024. Young admitted these transfers took place around the time the Judgment (after trial and either right before or after the jury issued its verdict). Young also admitted he did not receive anything in return for the transfers and that because he controlled Soul Quest's bank accounts, he retained control over the funds. While these facts may satisfy several badges of fraud, the Court cannot ignore one important fact –the Judgment was entered

against both Young and Soul Quest. Because Soul Quest was also obligated to Plaintiff under the Judgment, any transfers by Young to Soul Quest would not shield those funds from the creditor. Young also testified that he transferred the funds to pay attorneys. Based on these facts, the Court cannot conclude Plaintiff met its burden of establishing the requisite fraudulent intent with regard to these transfers.

Plaintiff further argues that Young concealed post-petition receipt of funds from Soul Quest. Specifically, Plaintiff points to $15,000 and a salary payment received post-petition along with certain revenue from the use of his RV which he did not disclose during his meeting of creditors. Nothing in the record, however, demonstrates that these payments represented property of the estate in this chapter 7 case or that Debtor had the requisite intent in not disclosing the transfers. The Court is not persuaded that this record establishes an intent to hinder, delay, or defraud creditors within the meaning of § 727(a)(2). Because Plaintiff has not proven that Young transferred or concealed property with the intent required by the statute, the Court will not deny his discharge under § 727(a)(2).

*Section 727(a)(3)*

Section 727(a)(3) of the Bankruptcy Code allows the court to deny a discharge when "the debtor has concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all circumstances of the case." 11 U.S.C. § 727(a)(3). Under § 727(a)(3), Plaintiff must establish: "(1) either that the debtor failed to keep or preserve any recorded information, or that he destroyed, mutilated, falsified, or concealed recorded information, and (2) that it is impossible to ascertain the financial condition of the debtor as a result of the debtor's conduct." *Fasolak*, 381 B.R. at 790; *see also Jones v. Rumptz (In re Rumptz)*, No. 3:19-bk-535, 2020 WL 2462528, at *6 (Bankr.

M.D. Fla. May 12, 2020). If Plaintiff meets this initial burden, the Debtor must then justify the inadequacies. *Rumptz*, 2020 WL 2462528, at *6.

Young's financial records were significantly deficient. He founded and operated an organization that served more than 30,000 retreat participants over approximately eight years, received substantial compensation from Soul Quest, and used the organization's bank accounts and credit cards for both organizational and personal expenses. Yet Young maintained no ledger reflecting amounts he advanced to Soul Quest. Given the extent of Young's financial relationship with Soul Quest, more complete records would have been expected. Young's testimony about his ADHD and dyslexia do not excuse this deficiency. Despite those conditions, Young was certified as an emergency medical technician and oversaw the operations of a business (Soul Quest) with over $3 million in annual revenue.[66] Young's attempts to portray himself as unable to understand basic business falls flat.

Section 727(a)(3), however, does not deny a discharge merely because a debtor's records are incomplete or disorganized. The statute requires a showing that the debtor's financial condition or business transactions cannot be ascertained from the available records. That showing has not been met. Young produced a substantial volume of documents, which he estimated to include approximately 9,000 pages. The evidence included his tax returns, bankruptcy petition, schedules, and statement of financial affairs; Soul Quest's bankruptcy schedules identifying the Chase accounts; parsonage records, including one reflecting annual payments of $58,022; information concerning Soul Quest credit cards; and records relating to Young's borrowing. The records were incomplete and difficult to reconcile, but they existed.

[66] Doc. 79 Trial Tr. 32:7-16; 95:1-9.

The evidence also demonstrates that Young's financial condition could be analyzed from the available information. Using the records produced, Plaintiff identified income discrepancies, traced personal expenses charged through Soul Quest, examined the Chase accounts, and established that Young received substantially more from Soul Quest in 2022 than he reported. The fact that Plaintiff was able to conduct that analysis weighs against a finding that Young's financial condition could not be ascertained within the meaning of § 727(a)(3). The statute requires more than difficulty in reconstructing financial information.

Because Plaintiff has not shown that Young's financial condition or business transactions could not be ascertained from the available records, the burden does not shift to Young to justify the inadequacies. Even if the burden had shifted, Young's explanations would not fully account for the deficiencies. His difficulty with numbers, reliance on attorneys and tax professionals, and loss of online access after filing do not explain the absence of a ledger or the lack of documentation concerning years of commingled finances. Those circumstances, however, are more consistent with poor recordkeeping and disorganization than with an effort to conceal or destroy information necessary to prevent creditors from understanding his financial affairs. Because Plaintiff has not established the elements required under § 727(a)(3), Young's discharge will not be denied under that provision.

*Section 727(a)(4)(A)*

Section 727(a)(4)(A) of the Bankruptcy Code allows the court to deny the debtor a discharge when the debtor "knowingly and fraudulently, in or in connection with the case ...made a false oath or account." 11 U.S.C. § 727(a)(4)(A). To justify denial of the debtor's discharge for a false oath, the false oath must be "fraudulent and material." *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991); *In re Daniel*, 613 B.R. 374, 381 (Bankr. M.D. Fla. 2020); *In re Wright*, 618 B.R. 569, 574 (Bankr.

M.D. Fla. 2020). A debtor's fraudulent intent is typically inferred by examining the totality of circumstances surrounding the debtor's bankruptcy case. *Wright*, 618 B.R. at 575-76. An oath is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Chalik*, 748 F.2d 616, 619 (11th Cir. 1984); *Daniel*, 613 B.R. at 381. An omission from the debtor's schedules and statements may constitute false oaths under § 727(a)(4)(A). *In re Phillips*, 476 F. App'x 813, 816 (11th Cir. 2012). However, a false oath made by inadvertence or mistake will not suffice. *See In re Rudolph*, 233 F. App'x 885, 889 (11th Cir. 2007).

Young's false statements could be deemed material, but the Court does not find they were fraudulent. Young reported approximately $260,000 in income for 2022 on his Statement of Financial Affairs, while the evidence reflected that he received over $500,000 from Soul Quest during that year, exclusive of Bitcoin transactions. He also signed tax returns reporting adjusted gross income of $240,500 for 2022 and $225,001 for 2023. In addition, Young attributed Chase accounts bearing his name to Soul Quest, omitted Soul Quest credit cards from his individual schedules, and used those accounts for certain personal expenses. These discrepancies and omissions concerned Young's income and financial relationship with Soul Quest – matters that creditors and the trustee were entitled to examine and constitute material information within the meaning of § 727(a)(4)(A).

Materiality, however, does not establish fraudulent intent. The remaining question is whether Young made these false oaths knowingly and fraudulently. Young testified that he believed the Chase accounts belonged to Soul Quest and that he disclosed them in Soul Quest bankruptcy case. He similarly testified that he believed the Soul Quest credit cards were obligations of the church rather than his individual obligations. Young asserted he had difficulty with numbers and relied on attorneys and tax professionals in preparing his bankruptcy documents. Reliance on professionals does not, by

itself, excuse inaccurate sworn statements. However, the evidence in the record does not support a finding that Young intended to make a false oath. Young's financial affairs with Soul Quest were poorly documented and extensively commingled, but the Court does not find that the inaccuracies were made with fraudulent intent. Young's conduct after filing also weighs against a finding of fraudulent intent. At the meeting of creditors, Young identified potential omissions and understood that counsel would address them through amendments. Although those omissions should have been corrected, the disclosure of potential inaccuracies is inconsistent with an effort to conceal them from creditors or the trustee.

Considering the totality of the circumstances, the evidence does not reflect a debtor who knowingly and fraudulently made false oaths to hinder the administration of his bankruptcy estate. Plaintiff has established material inaccuracies and omissions in Young's bankruptcy disclosures. Plaintiff has not, however, established that Young knowingly and fraudulently made those false oaths as required by § 727(a)(4)(A). Accordingly, Young's discharge will not be denied under § 727(a)(4)(A).

**Conclusion**

For the reasons stated above, the Court concludes that Plaintiff has not met his burden of proving that Young's debt is excepted from discharge under 11 U.S.C. § 523(a)(6). The Court further concludes that Plaintiff has not established grounds to deny Young a discharge under 11 U.S.C. §§ 727(a)(2), 727(a)(3), or 727(a)(4)(A). Accordingly, judgment will be entered in favor of Young and against Plaintiff on all counts of the Complaint. The Court will enter a separate final judgment consistent with this Order.

###

The Clerk is directed to serve a copy of this Order on all interested parties.